T.C. Memo. 2000-173


UNITED STATES TAX COURT


ARNOLD REISMAN AND ELLEN REISMAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18805-97.                    Filed May 25, 2000.


Arnold Reisman and Ellen Reisman, pro sese.

Marc A. Shapiro, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, Judge:  Respondent determined a deficiency of $117,567

in petitioners' joint 1994 Federal income tax.

The only issue for decision[1] is whether a $350,000 payment

---

[1]Petitioners paid $38,533 in legal fees in 1994, which the
parties have stipulated will qualify as a miscellaneous expense
on Schedule A, Itemized Deductions, if this Court holds that the
(continued...)

received by petitioners from Case Western Reserve University in 1994 is excludable from gross income under section 104(a)(2).[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Shaker Heights, Ohio, at the time they filed their petition.

Mr. Reisman was employed by Case Western Reserve University (CWRU) as a tenured full professor of operations research in the Weatherhead School of Management. Mr. Reisman filed a lawsuit in the U.S. District Court, Northern District of Ohio (Federal case), and petitioners filed another lawsuit in the Cuyahoga County Common Pleas Court (State case). Both lawsuits were filed against CWRU and various individuals. The claim asserted in the Federal case involved age discrimination. The claims asserted in the State case involved age discrimination, invasion of privacy, defamation, intentional infliction of emotional distress, and loss of consortium.

The Federal case was tried before a jury in February 1993,

---

[1](...continued)
$350,000 in dispute is includable in petitioners' 1994 gross income.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

resulting in a verdict in favor of CWRU. Mr. Reisman appealed the Federal case to the Court of Appeals for the Sixth Circuit. While the Federal case was on appeal, attorneys representing petitioners and CWRU entered into settlement negotiations. Steve Goldfarb (Mr. Goldfarb) was one of the attorneys who negotiated on behalf of CWRU. CWRU was not interested in any settlement which would allow Mr. Reisman to remain at the university. Before a final settlement was reached, Mr. Goldfarb received a letter dated October 26, 1994, from one of the attorneys who represented Mr. Reisman. The letter contained the following passage:

> As I conveyed to you, Steve [Goldfarb], Dr. Reisman's preference is to structure a settlement in which he would remain at the university. You indicated, however, that the only settlement offer which Case Western Reserve University would consider would be one in which Dr. Reisman leaves the university * * *

On November 16, 1994, while the Federal case was pending in the Court of Appeals for the Sixth Circuit and the State case was pending in the Cuyahoga County Common Pleas Court, petitioners, CWRU, and the various individuals named in the two lawsuits entered into a Confidential Mutual Release and Settlement Agreement (settlement agreement). In the settlement agreement, the parties agreed that Mr. Reisman had also asserted breach of contract in both lawsuits.

The settlement agreement provides, in part:

> The Parties acknowledge and agree that the
> settlement of this matter and CWRU's payment
> [of $350,000] pursuant to * * * this
> Agreement represents the compromise of
> disputed claims and compensation to Arnold
> Reisman for the resignation of his position
> and the relinquishment of his tenure rights
> * * *

The settlement agreement also provides, in part:

> CWRU's settlement and payment in no manner
> constitutes an admission of any liability to
> Reisman, it being expressly understood that
> CWRU vigorously disputes and denies each and
> every claim asserted against CWRU by Reisman.

No allocation was made in the settlement agreement among the various claims settled, nor was a specific amount allocated for Mr. Reisman's resignation and relinquishment of his tenure rights. CWRU viewed the settlement as a buyout of Mr. Reisman's tenured contract. The university normally buys out a tenured position at approximately three times the individual's annual salary.

In accordance with the terms of the settlement agreement, CWRU paid petitioners $350,000 on or before December 22, 1994. Also in accordance with the terms of the settlement agreement, Mr. Reisman resigned his tenured faculty appointment from CWRU, effective December 22, 1994. At the time of his resignation, Mr. Reisman was earning between $92,000 and $100,000 per year exclusive of benefits.

Petitioners did not report the $350,000 received from CWRU on their 1994 Form 1040, U.S. Individual Income Tax Return.

OPINION

The issue is whether the $350,000 payment received by petitioners from CWRU in 1994 is excludable from gross income under section 104(a)(2).[3]  Petitioners argue that the $350,000 payment from CWRU is from a tort-based suit and represents nontaxable compensation for personal injuries under section 104(a)(2).

Gross income includes income from whatever source derived. See sec. 61(a).  Gross income does not include the amount of any damages received on account of personal injuries or sickness. See sec. 104(a)(2).  "The term 'damages received (whether by suit or agreement)' means an amount received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution."  Sec. 1.104-1(c), Income Tax Regs.  In order for damages to be excludable from gross income under section 104(a)(2), the taxpayer must demonstrate that:  (1) The underlying cause of action is based upon tort or tort type

_____

[3]The Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1605(a), 110 Stat. 1838, amended sec. 104(a)(2) to limit the exclusion, inter alia, to "personal physical injuries or physical sickness".  The amendment does not apply to damages collected before the date of its enactment and has no bearing here.

rights, and (2) the damages were received on account of personal injuries or sickness.  See Commissioner v. Schleier, 515 U.S. 323, 337 (1995).

Where amounts are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement and not its validity controls whether such amounts are excludable from gross income under section 104(a)(2).  See Seay v. Commissioner, 58 T.C. 32, 37 (1972).  "[T]he critical question is in lieu of what was the settlement amount paid?"  Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997).

In the instant case, the settlement agreement does not allocate the $350,000 lump-sum payment among petitioners' various claims, so we will examine the nature of each claim in turn. First, the Federal lawsuit was brought under the Age Discrimination in Employment Act of 1967 (ADEA), Pub. L. 90-202, sec. 2, 81 Stat. 602.  Recovery under ADEA is not based upon tort or tort type rights.  See Commissioner v. Schleier, supra at 334-336.  Thus, any portion of Mr. Reisman's claim allocated to the Federal claim would be taxable.

Second, in the State action, petitioners sought compensatory and punitive damages for a statutory claim of age discrimination and several common law claims, including invasion of privacy, defamation, intentional infliction of emotional distress, and

loss of consortium. To the extent CWRU's payment was in exchange for Mr. Reisman's tenure, the settlement proceeds would not be excludable from gross income under section 104(a)(2). See Kurowski v. Commissioner, T.C. Memo. 1989-149, affd. 917 F.2d 1033 (7th Cir. 1990). To the extent any of CWRU's payment was for breach of contract, the settlement proceeds would not be excludable from gross income under section 104(a)(2). See Robinson v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part and revd. in part on another issue 70 F.3d 34 (5th Cir. 1995). Finally, to the extent any of CWRU's payment was for punitive damages, then the proceeds would not be excludable from gross income under section 104(a)(2). See O'Gilvie v. United States, 519 U.S. 79, 90 (1996).

In short, the nature of most of petitioners' claims that were resolved as part of the settlement agreement are nontort type and would not be excluded from gross income under section 104(a)(2).

Some of petitioners' common law claims are tort type claims. Petitioners argue that, as a result of res judicata, the only claims outstanding at the time of the settlement were personal injury tort claims. We disagree.

The settlement agreement provides that petitioners are being compensated for the compromise of disputed claims and for Mr. Reisman's resignation and relinquishment of his tenure rights.

The settlement agreement clearly provides that the parties intended the agreement to settle any and all claims, including claims that were raised or could be raised in the Federal case, which was on appeal, and the State case. Joel Makee (Mr. Makee), chief legal counsel at CWRU and a partner at Kelley, McCann & Livingstone, testified that a portion of the payment was paid to settle the Federal case on appeal because appeals are expensive. The settlement agreement also provides that part of the payment was paid to resolve a breach of contract claim.

Respondent argues that since the settlement agreement did not allocate the lump-sum payment among Mr. Reisman's various claims, the entire amount is includable in petitioners' gross income. When a settlement agreement includes both contract and tort claims, and the claims are not specifically apportioned, the courts may not be in a position to apportion the settlement payment among the various possible claims. See Taggi v. United States, 35 F.3d 93, 96 (2d Cir. 1994).

As we stated previously, the settlement agreement referred to both contract and tort type claims. The settlement agreement did not allocate the settlement proceeds among the various claims. Generally, when a settlement deals with a number of claims and does not allocate the proceeds to specific claims, and there is no evidence that a specific claim was meant to be singled out, we consider the entire amount taxable. See Morabito

v. Commissioner, T.C. Memo. 1997-315. Where a settlement agreement lacks express language stating that the payment was (or was not) made on account of personal injury, we have previously stated that the most important fact in determining how section 104(a)(2) is to be applied is "the intent of the payor" in making the payment. Metzger v. Commissioner, 88 T.C. 834, 847-848 (1987), affd. 845 F.2d 1013 (3d Cir. 1988). In the absence of an express settlement agreement, the payor's purpose in making the payment is the most important factor. See Knuckles v. Commissioner, 349 F.2d 610 (10th Cir. 1965), affg. T.C. Memo. 1964-33.

Respondent argues that CWRU did not intend to compensate petitioners for any purported personal injuries resulting from tort or tort type claims.

According to the terms of the settlement agreement, the parties acknowledged and agreed that CWRU's payment represented the compromise of disputed claims and compensation to Mr. Reisman for resigning his position and relinquishment of his tenure rights. Mr. Goldfarb testified that he was one of the attorneys responsible for negotiating the settlement agreement on behalf of CWRU and the primary drafter of the agreement. Mr. Goldfarb indicated that CWRU attempted to settle with Mr. Reisman for $300,000 because the university viewed the settlement as a buyout of Mr. Reisman's tenured contract, and the university normally

buys out a tenured position at approximately three times the individual's annual salary. At the time, Mr. Reisman was earning approximately $100,000 per year exclusive of benefits. Mr. Goldfarb testified that $300,000 was paid for Mr. Reisman's resignation of his position and relinquishment of his tenure rights, and $50,000 was paid to "close the deal" and settle all litigation.

Mr. Makee negotiated the final settlement agreement on behalf of the university along with attorney Mr. Goldfarb.[4] Mr. Makee also testified that the $300,000 offered to buy out Mr. Reisman's tenured position was based on three times his salary and that the additional $50,000 was paid to settle the litigation. Mr. Makee testified that the university was looking at the additional payment from a litigation management point of view. According to Mr. Makee, the university had been very successful in the Federal case but there was a pending appeal in the Sixth Circuit and "appeals are very expensive." Additionally, the university was aware that it would incur additional legal services and costs in the pending State case. According to Mr. Makee, CWRU was taking into consideration future litigation costs when it authorized the increased settlement agreement amount and that the university did not intend to

---

[4]Mr. Goldfarb was also an attorney with Kelley, McCann & Livingstone when the settlement agreement was drafted.

compensate Mr. Reisman for any alleged personal injuries.

The importance of Mr. Reisman's leaving the university in order to settle the dispute was conveyed in a letter written by one of Mr. Reisman's attorneys to Mr. Goldfarb, which stated:

> As I conveyed to you, Steve [Goldfarb], Dr. Reisman's preference is to structure a settlement in which he would remain at the university. You indicated, however, that the only settlement offer which Case Western Reserve University would consider would be one in which Dr. Reisman leaves the university * * *

According to testimony provided by Mr. Makee, CWRU would consider only a settlement with Mr. Reisman's leaving the university because he was unhappy with the university and the university was unhappy with him. Mr. Makee also indicated that Mr. Reisman had engaged in what the university considered disruptive conduct as a faculty member. Thus, the university was concerned that if it settled the litigation, and Mr. Reisman remained at CWRU, there would be no guaranty that he would not continue that kind of conduct. Finally, Mr. Makee testified that if Mr. Reisman refused to resign and continued to teach at CWRU, then the university's position was to pay nothing to settle any of the outstanding claims, except perhaps a nominal sum of about $5,000 as a nuisance payment. CRWU's position was based on the fact that it had won the Federal age discrimination complaint, which was Mr. Reisman's primary lawsuit. As a result, CRWU was prepared to defend the Federal case on appeal and the State case as it was developing.

Petitioners argue that because CWRU did not issue a Form W-2, Wage and Tax Statement, or a Form 1099 for the amount of the settlement proceeds, or withhold taxes on the settlement proceeds, the university must have intended the payment to be nontaxable.[5]  We disagree.

Mr. Makee testified that CWRU did not issue a Form W-2 or 1099 because Mr. Reisman's counsel refused to discuss allocating the settlement payment.  Under the circumstances, Mr. Makee felt that it was inappropriate to issue a Form 1099.  Notwithstanding the fact that Mr. Reisman's attorneys would not discuss allocating the proceeds, CWRU settled when negotiations were ripe for settlement because according to Mr. Makee, Mr. Reisman's case was particularly difficult, but one that Mr. Makee felt should be resolved.

Overall, we believe that the settlement agreement was entered into to settle an employment dispute, not to settle tort type claims.  The record supports our finding that approximately $300,000 of the lump-sum payment by CWRU was in exchange for Mr. Reisman's resignation of his position and the relinquishment of his tenure rights.  Regarding the remaining $50,000, petitioners

---

[5]Petitioners also argue that a letter written by one of their attorneys who negotiated the settlement agreement on their behalf, expressing his belief that the payment was nontaxable, is evidence of CWRU's intent.  We disagree.  The letter written by one of petitioners' attorneys stating that he believed the proceeds were nontaxable is not directly relevant as to what CWRU intended.

have failed to establish which portion, if any, was paid to settle tort type claims for personal injuries. Petitioners bear the burden of proving that a specific portion of the settlement proceeds was paid to settle tort or tort type claims for personal injuries and thus excludable under section 104(a)(2). See Rule 142(a). We hold that the entire $350,000 must be included in petitioners' 1994 gross income.

<u>Decision will be entered</u>

<u>for respondent</u>.